## Kewanee Boiler Co. v. A. G. Erickson.

1. MASTER AND SERVANT—*Duty of the Master.*—It is the duty of the master to use reasonable care to furnish his servant a reasonably safe place in which to perform his work. This is a positive obligation rest-ing upon the master and he is liable for the negligent performance of such duty, whether he undertakes its performance personally or through another servant.

2. SAME—*When the Servant Assumes the Risk.*—If the servant knows of the danger, or by the exercise of reasonable care might know and avoid it, but voluntarily assumes the risk, he can not recover for an injury sustained, even though the master may have been negligent in his duty to the servant.

3. NEGLIGENCE—*When the Master Has Knowledge of Danger and Fails to Inform the Servant.*—The servant has a right to rely on the statements of the master, and if he knows a place is dangerous and fails to inform the servant, it is such negligence as will authorize a recovery.

Trespass on the Case, for personal injuries. Trial in the Circuit Court of Henry County; the Hon. WILLIAM H. GEST, Judge, presiding. Verdict and judgment for plaintiff. Appeal by defendant. Heard in this court at the May term, 1898. Affirmed. Opinion filed September 26, 1898.

HENRY CURTIS, attorney for appellant; BLISH & LAWSON, of counsel.

N. F. ANDERSON, attorney for appellee.

MR. JUSTICE CRABTREE delivered the opinion of the court. This was an action on the case brought by appellee

against appellant to recover damages for personal injuries sustained by him while in the employ of appellant as a boiler maker.

Appellant was a corporation engaged in the business of making and repairing steam boilers at Kewanee, and the accident which caused appellee's injury happened in consequence of steam coming into the No. 4 boiler of the Western Tube Company (another corporation) through the blow-off pipe or " mud leg."

The Western Tube Company had in operation at its plant in Kewanee, a battery of four large steam boilers for the generation of steam to supply the motive power for its said plant. These were large boilers set horizontally in brick masonry side by side and close to each other, with upright brick walls between them; the four boilers and masonry forming one compact structure.

At the rear of this battery of boilers was a main blow-off pipe extending the whole length of the battery, and connected therewith were separate blow-off pipes to each boiler, with valves and cocks so arranged that each boiler might be used separately or in connection with its fellows, and the steam shut out of any one boiler while being used in the others, as the necessities or convenience of the business might require. The boilers were numbered consecutively 1, 2, 3 and 4, No. 4 being the most southerly of the lot. When the entire battery of boilers was in action the valves in the blow-off pipes (or "mud legs" as they are sometimes called by the witnesses) are all left shut, but whenever for the purpose of cleaning, washing out or repairing any one of the boilers it was desired to separate it from the others in the battery, leaving them in action, it could be done by closing a valve leading from the generator or header above into the dome, which would cut off the live steam and prevent it from entering the boiler, thus entirely isolating the boiler thus cut off. But if the valve in one of the " mud legs " of the " live " boilers were opened, and at the same time the valve in the " mud leg " of the isolated boiler were left open, then if the pressure were

sufficient, there would be a rush of steam from the live
boilers through the common or general blow-off pipe of the
battery into such isolated boiler.   Perhaps this is a suffi-
cient statement as to the situation of the boilers and their
connections, to a fair understanding of the manner in which
appellee's injury occurred.

It having been discovered that boiler No. 4 of the bat-
tery described required to be repaired by a patch in the
bottom of the shell, Norval D. Bailey, the Tube Company's
superintendent in charge of the plant, applied to appellant
to make such repairs.   An arrangement was made with the
witness Horton Vail, appellant's vice-president and super-
intendent, to make such repairs, and it was agreed that the
Tube Company should have the boiler in question (No. 4)
blown off and cooled down by four o'clock of Saturday after-
noon, March 14, 1896, so that appellant's men could go to
work thereon at that time, but the hour was subsequently
changed to nine o'clock of the same evening, when it was
arranged that appellant should send its men to remove the
tubes or flues from the boiler, which was necessary to be
done before the repairs could be made.   It was not neces-
sary that men should enter the boiler to remove the flues.
It was further arranged that on Sunday morning appellant
would send other men to patch the boiler and reset the
flues.   The Tube Company was also to send men to "scale"
the boilers; that is, to remove with hammers the lime or
"scale" accumulated on the interior thereof by the evap-
oration of water used therein.   This work required that the
men engaged in it should enter and work in the boiler.

In arranging for the repair of the boiler, Vail told Bailey
that he would not allow appellant's men in the boiler with
steam on in any of the other boilers, and Bailey said that
would be all right and that steam would be shut off Sunday
morning.   With this understanding Vail directed appellee
and other of the boiler makers to go to this boiler No. 4 on
Sunday morning to assist in making the repairs, at the same
time telling appellee that everything would be ready by that
time.   In accordance with this direction, appellee and two

other servants of appellant, viz., Lindberg and Larson, went to this boiler on Sunday morning, entered it and commenced work on the repairs. The boiler was cold and there does not appear to have been any indication of danger to the men while there employed, or anything to cause them to make inquiry in that regard. But while they were thus engaged in their work, and without any warning whatever, a sudden rush of steam and hot water came into the boiler, and before appellee could make his exit therefrom he was so badly scalded as to be seriously and permanently injured.

The negligence charged in the declaration was, that appellant failed to use reasonable care to provide a safe place for appellee in which to do the work required of him. The defense relied upon was that appellee knew, or, by the exercise of reasonable care might have known of the danger and avoided it.

The cause was tried by a jury, resulting in a verdict in appellee's favor for $2,500, upon which the court entered judgment after overruling a motion for new trial, and the defendant appealed to this court.

The law is well settled that it is the duty of the master to use reasonable care to furnish his servants a reasonably safe place in which to perform his work; that this is a positive obligation resting upon the master, and he is liable for the negligent performance of that duty, whether he undertakes its performance personally or through another servant. C. & A. R. R. Co. v. Scanlan, 170 Ill. 106.

It is also the law that if the servant know of the danger, if any exist, or by the exercise of reasonable care might know of and avoid it, but voluntarily assumes the risk, he can not recover for any injury sustained even though the master may have been negligent in his duty to the servant. This is too familiar a proposition to need any citation of authorities in its support, but we fail to see that it has any proper application in the case at bar. There is no proof that appellee knew there was any steam on in the boilers adjoining that in which he was working, and no reason appears why he should have looked for, or examined to see

if there was danger. The boiler he entered was cold, and other men were working in it when he arrived there. He had a right to rely on the assurance of Vail that everything would be ready for him at seven o'clock Sunday morning; the time he was directed to go to work. According to the testimony of Vail, Bailey had promised to have the steam down in all the boilers by that time, and had refused to let his men enter into "No. 4" until the steam was out of the whole battery, no doubt because he knew it would be dangerous for them to do so. From the testimony of Bailey it appears that he informed Vail on Saturday afternoon that steam would be required for the annealing furnace until some time on Sunday morning, the precise time, however, not being stated. At any rate Vail was on the ground on Sunday morning for some fifteen minutes before the injury to appellee, and discovered that there was steam in the boilers. He talked with Stanton, the fireman or engineer, about it, but gave no notice to appellee, although he must have known it was dangerous, because he had declared his men should not enter the boiler to make the repairs until the steam was out of all the boilers. We think this was such negligence as authorized a recovery. Vail had no right to tell appellee everything would be ready for him unless such were the fact and all reasonable precautions had been taken to secure his safety. Appellee had a right to rely on this statement of Vail and to presume the conditions were safe unless something occurred to put him upon inquiry as to the contrary, and nothing of the kind appears in the evidence.

On the other hand, even though Vail may have supposed when he gave the directions to appellee to go to work as stated, that all proper precautions had been taken, still when he discovered that steam was in the boilers and that thereby appellee was in danger, it was his duty to have given notice to appellee that he might avoid the danger. Not to do so was such negligence as rendered appellant liable for the injury.

We find no material error in the rulings of the court

upon the evidence, nor in the giving, refusing or modifying instructions. The instructions asked by appellant and refused by the court, ignored the duty of appellant to give notice of the danger when discovered by Vail.

On the whole we think the jury were fairly instructed as to the law of the case, and we see no sufficient reason for reversing the judgment. It will therefore be affirmed.